## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**UNITED STATES OF AMERICA,**

**vs.**                                                    **1:92cr1027-MMP/AK**

**EDGAR ARNOLD GARCIA,**

     **Defendant.**

_____/

### REPORT AND RECOMMENDATION

     This cause is before the Court on Defendant's second amended § 2255 motion.  Doc. 83.

The Government has filed a response, Doc. 93, but the Court denied Defendant's attempts to file

a lengthy reply.  Doc. 99.  That decision was affirmed by the district judge, Doc. 101, and thus,

this case is in a posture for decision.  Having carefully considered the matter, the Court

recommends that the second motion to vacate be denied.

### BACKGROUND

     This case arose from an investigation into the 1991 murder of Marty Cryer, who was shot

by Defendant after he failed to pay a substantial drug debt.  Doc. 57 at 12; *United States v.*

*Garcia*, 208 F.3d 1258, 1260 (11th Cir. 2000).[1]  Shortly after the murder, Defendant absconded to

---

[1]The United States Supreme Court vacated the Eleventh Circuit's judgment and
remanded the case for further consideration in light of *Apprendi*.  Upon remand, the court of
appeals reinstated the judgment affirming the conviction and sentence.  Doc. 69.

Canada, where he was located by the Royal Canadian Mounted Police in June, 1992, living in a religious community under an assumed name. Doc. 57 at 24; *Garcia*, 208 F.3d at 1260.

Defendant was subsequently indicted on July 15, 1992, for conspiracy to distribute and to possess with intent to distribute marijuana (Count One), for possession with intent to distribute marijuana (Count Two), and for using and carrying a firearm during and in relation to the marijuana offenses (Count Three). Doc. 2; *Garcia*, 208 F.3d at 1260. After almost five years of extradition proceedings, Defendant was finally returned to the United States in May, 1997. At his first appearance, the magistrate judge advised Defendant that he was facing a maximum penalty of forty years on Count One, twenty years on Count Two, and five years on Count Three. Doc. 8. Approximately two months later, he pled guilty to Counts One and Three of the Indictment.

At the plea hearing, the Court began by advising Defendant as follows:

THE COURT: It's your right, sir, to plead guilty to each of those charges. However, before I accept your guilty plea, I must first determine that your decision to plead guilty is freely and voluntarily made, and that there is a factual basis to support that guilty plea. So it therefore becomes necessary that I ask you certain questions.

\* \* \*

Now, do you understand, sir, what I have told you?

THE DEFENDANT: Yes, sir.

THE COURT: It is also necessary, Mr. Garcia, that the answers to my questions be given under oath.

I do caution you now that the answers you are about to give may be later used against you in a separate prosecution for perjury or false swearing regardless of the outcome of your present case, if the answers you give to me are, in fact, untrue.

> So do you understand the necessity of giving truthful
> answers to all of my questions?

THE DEFENDANT: Yes, sir.

Doc. 57 at 4-5.  Defendant was then sworn.

After a series of background questions, the Court advised Defendant of the rights he

waived by pleading guilty and queried him as follows:

> THE COURT:  A plea of guilty, Mr. Garcia, does admit the truth of the charge or
> charges brought against you, while a plea of not guilty denies that
> charge.
>
> So do you understand, sir, the difference between a guilty
> and a not guilty plea?

THE DEFENDANT: Yes, sir.

*Id*. at 9.

The Government then placed in the record the "facts [it] would be prepared to prove at

[Defendant's] trial if there was to be a trial."  *Id*. at 11; *see also* Doc. 23.  The recitation of facts

was lengthy and included several "parenthetical note[s]" in which Defendant indicated his

acquiescence to certain facts but a lack of knowledge or specific recall as to others.  *See*, *e.g*., *id*.

at 15.  The Government concluded as follows: "It is understood that the defendant may not wish

to discuss his involvement in the murder itself until he has resolved pending state murder

charges, but does not dispute using and carrying a firearm in furtherance of the drug conspiracy."

*Id*. at 24.  At the end of the Government's statement, the Court questioned Defendant:

> THE COURT:  Mr. Garcia, did you hear what the government had to say
> about the facts of the case and your involvement?

THE DEFENDANT: Yes, sir.

> THE COURT:  Are these true facts?

THE DEFENDANT:   Yes, sir, they are correct, with the caveat that there are a few areas of the factual statement that I have no personal knowledge of....But I have no reason to say they are incorrect.

The last full paragraph of the factual statement...is correct, and that–I do claim responsibility and I'm guilty of carrying a firearm in furtherance of a controlled substance offense as alleged in Count III.

But upon advice of counsel, I would assert a Fifth Amendment privilege to the U.S. Constitution in regard to any language referring to or asserting that I have any culpability for the murder of Phillip Martin Cryer.

THE COURT:   I'm handing you a document Factual Basis for Plea....Is that your signature on there, sir?

THE DEFENDANT: Yes, Your Honor, it is.

*Id*. at 24-25.

The Court then advised Defendant of the penalties he faced:

THE COURT:   The maximum penalty that could be imposed upon your plea of guilty to the offense of conspiracy to possess with the intent to distribute marijuana is 40 years in prison....There is also a five-year minimum mandatory sentence prescribed by law for that offense.

But, do you understand, as to the offense in Count I, that you do face up to 40 years in prison and a five-year minimum mandatory sentence?

THE DEFENDANT: Yes, sir.

THE COURT:   As to the offense in Count No. III, which is using or carrying a firearm in relation to a drug trafficking crime, there is a mandatory five years that must run consecutive to the sentence imposed in Count Number I....

Do you understand, sir, that as to Count No. III, there is a mandatory five-year consecutive prison sentence that

would be imposed upon you following any sentence that is imposed as to the offense in Count Number I?

THE DEFENDANT:  Yes, sir.

*Id*. at 25-26.

Defendant then indicated that he had signed the Plea Agreement and that he understood its terms and that he and his attorney had discussed the Sentencing Guidelines and how they might apply to him and the facts of his case.  *Id*. at 26-27.  More specifically, the Court advised the Defendant:

THE COURT:        [Y]ou understand, sir, that this Court will not be able to determine your guideline sentence for this case until after the presentence report has been completed, and both you and the government have had the opportunity to challenge any of the factual matters reported to me by the probation officer?

THE DEFENDANT:  Yes, sir.

THE COURT:        Do you also understand, that after it has been determined what guidelines do apply to you and to the facts of your case, that this Court still has the authority, under certain circumstances, to impose a sentence that is either more severe or one that is less severe than that which is called for by the guidelines?

THE DEFENDANT:  Yes, sir.

* * *

THE COURT:        And do you understand, also, that since the statute involved as to the offense in Count No. III requires the imposition of a minimum-mandatory consecutive sentence, that that sentence must be imposed upon you, regardless of what your guideline sentence might call for?

THE DEFENDANT:  Yes, sir.

THE COURT:        And under the terms of the plea agreement, certain charges are to be dismissed against you.  You understand, sir, that

even though those charges are going to be dismissed against you pursuant to your plea agreement, that this Court must still take those dismissed charges into account in determining the appropriate sentence to be imposed upon you?

THE DEFENDANT: Yes, sir.

*Id*. at 26-28.

The Court then reviewed the plea agreement with Defendant, specifically noting:

"Nothing in the agreement, Mr. Garcia, protects you from a charge of perjury, if you should, in

fact, commit perjury.  The sentence to be imposed is left solely to the discretion of this Court."

*Id*. at 29.  Defendant acknowledged his understanding of these matters.  The Court questioned

him further:

| | |
|---|---|
| THE COURT: | Now, have you and your lawyer discussed this plea agreement and he explained to you in more detail than I have just done all of its terms and conditions? |
| THE DEFENDANT: | Yes, sir, Your Honor.  He has. |
| THE COURT: | Has anyone made any promise to you, Mr. Garcia, other than those which are set forth in the written plea agreement, that has in any way induced you or led you to plead guilty to those charges? |
| THE DEFENDANT: | No, sir. |
| THE COURT: | Does the written plea agreement, in fact, contain all promises and understandings that you have reached with the government, and based upon the terms of which you are entering your guilty plea here this afternoon? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Are there any secret or any undisclosed promises or inducements that have led you to plead guilty to this charge? |
| THE DEFENDANT: | No, sir. |

THE COURT:             And by that, sir, I mean, neither the government, your
                       lawyer, or any person, has told you anything or promised
                       you anything that is different from those matters that are
                       contained in the written plea agreement, or in addition to
                       the matters that are contained in the written plea agreement
                       that has led you or contributed to your decision to plead
                       guilty to this matter or this charge?

THE DEFENDANT: No, sir.  No one has.

THE COURT:             Any person used any type of threat, force, pressure,
                       intimidation of any type to make you plead guilty?

THE DEFENDANT: No, sir.

THE COURT:             You are represented by Mr. Miller.  He is in court with you
                       this afternoon.  Have you had sufficient time to discuss
                       your case fully with Mr. Miller, and explain to him
                       everything you know about the facts of the case and your
                       involvement in it?

THE DEFENDANT: Yes, sir.

THE COURT:             And have you done that?

THE DEFENDANT: Yes, I have.

THE COURT:             During the conferences with your lawyer, has he generally
                       answered any of your questions about this case, and has he
                       disclosed to you where he thinks you may fall within the
                       sentencing guidelines, based upon his current knowledge of
                       the facts of the case and any prior criminal history that you
                       may have?

THE DEFENDANT: Yes, sir, he has.

THE COURT:             Are you satisfied with your attorney and the way that he
                       has represented you in this case?

THE DEFENDANT: Yes, sir, I am.

THE COURT:             Do you have any complaint whatsoever about the way that
                       Mr. Miller or anyone from the office of the Federal Public
                       Defender's office has represented you?

THE DEFENDANT:  No, sir, I do not.

THE COURT:  And, Mr. Miller, as the attorney for Edgar Arnold Garcia, do you now assure the Court, that insofar as you know, there have been no assurances, promises, or understandings been given to this defendant as to the disposition of his case which are different or contrary to what I have discussed with him and we've now made a matter of record here in open court?

MR. MILLER:  I can so assure the Court.

THE COURT:  Can the government give me the same assurances?

MR. SIMPSON:  Yes, sir.

*Id*. at 30-33.

In accepting the change of plea, the Court stated:

I now find you Edgar Garcia to be alert and intelligent, that you do understand the nature of the charges against you and do appreciate the consequences of pleading guilty.

I find also the facts the government is prepared to prove and the facts that you have admitted and stated under oath in open court as being true and correct are sufficient to sustain your guilty plea.

I further find that your decision to plead guilty is freely, voluntarily and intelligently made, and that you have had the advice and counsel of a competent lawyer with whom you say you are well pleased.

*Id*. at 33.

Shortly thereafter, the Government submitted its sentencing memorandum in which it requested that the Court sentence Defendant to a sentence "at or near the statutory maximum of 40 years for Count I, consecutive to the mandatory five year sentence on Count III." Doc. 25. By letter dated, August 14, 1997, Defendant wrote his attorney discussing the Government's sentencing memorandum. In pertinent part, Defendant stated:

The extent of the untruths contained in the government's factual basis consumes almost the entirety of the document. Each small iota of concern I had about each untruth has now turned into the prosecution's strongest evidence. The extent from which the government quotes from the document is alarming, and I must say that I am truly sorry for ever signing it, and do believe I was verily forced to sign it, overwhelming force at that. If it had not been the third re-write and if it had not been literally within minutes of the hearing I would never have signed it. Your counsel that Judge Paul is known to leave the bench during pleas where the defendant questions the facts and that the untruths would be dealt with at sentencing was the deciding factor, yet I can not help but think that the whole affair could have been delayed pending the appropriate changes. The two most damaging consequences thereof in my estimation as I have discovered to date are that:

a) the threshold for the burden of proof is substantially lower at sentencing than at trial, resulting in the fact that I have inadvertently created for the prosecution their strongest evidence which is evident in the fact that the prosecution largely and almost solely relies on the government's factual basis and the untruths therein as the cornerstone of their sentencing strategy, and that

b) my assumption of assured downward departure of three points for acceptance of responsibility is not a guaranteed right.

At the conclusion of our last meeting you asked if I wanted you to file a motion to strike plea....

In order to go forward with sentencing without the added exposure of certain unnecessary upward departure related to my inadvertent admission to untruths the court must have a record [of] my entire composition entitled "Defendant, Edgar Garcia's, concerns regarding the Government's factual basis for plea dated July 25, 1997, as discussed with AFPD Tom Miller."

* * *

Let me reiterate that I do not wish to file a motion to strike plea providing the above is implemented.

Doc. 83, Attach. L.

By letter dated September 8, 1997, Defendant wrote the Court directly regarding the

factual basis for his plea:

It saddens me greatly to write this letter; nonetheless, I...humbly beg Your Honor's indulgence regarding the following which concerns the government's

factual basis for plea dated July 25, 1997, that I signed on the same day within an hour before being brought before Your Honor to enter my guilty plea.

Before I go on let me first say that I am in no way indicating to Your Honor that I am not guilty of the charges I pled guilty to....I am only writing because of my concerns regarding the government's factual basis for plea that I subsequently signed and the many untruths contained therein.

The fallacies contained in the document are numerous.  The reason I signed it is clear in my letter dated August 14, 1997, to AFPD Tom Miller....The untruths are itemized in my composition titled "Defendant, Edgar Garcia's, concerns regarding the government's factual basis for plea...."

The reasons I was led to believe that it was OK to sign the document, regardless of the untruths are found on pages (6) and (7) of the above mentioned composition.  It is against my lawyer's advice that I write you...and submit the truths regarding the untruths in the government's factual basis.

Doc. 33.

Attached to the letter is Defendant's "concerns" document.  In pertinent part, the

document outlines the following concerns regarding the Statement of Facts:

1) I believe Alley exaggerates both his recollection of the total deliveries of marijuana and cocaine.

2) Regarding...the current sentence [which] reads  "Garcia got the marijuana from Benny, also known as Junior, and from Jessie, who worked together."  This is incorrect and should read "Garcia got the marijuana from Benny, also known as Junior."

3) Regarding page (5) para. (2) there is in parenthesis "Garcia recalls the conversation about kidnapping, but does not specifically remember the comment about killing Marty."  This is incorrect.  It should read that "Garcia recalls Gloria raising a conversation about kidnapping, but never had a conversation about killing Marty."

4) Regarding...the next sentence [which] reads "Garcia offered to continue supplying...."  This is incorrect and should read "Garcia agreed to continue supplying...."

5) Regarding page (6) point (5) Monica Poole says "She also saw Garcia package methamphetamine."  This is incorrect and should read "At Poole's request Garcia

located...methamphetamine for Poole which she repackaged...for her personal designs...."

* * *

6) Regarding page (6) last paragraph in parenthesis which states "Garcia remembers asking Poole to clean out the apartment but does not recall how the request was phrased."  This is incorrect and should read "Garcia remembers asking Poole to clean out the apartment but did not mention drugs or money."

7) [I]n the same paragraph...there is a sentence that reads "Enriquez took the cocaine."  This is incorrect.  There was no cocaine in the apartment. I subsequently requested from my lawyer that this sentence be removed.

8) Regarding page (7) para (1) in parenthesis "Garcia was not present and does not know exactly what was removed and who may have received which drugs." This is incorrect and should read "Garcia was not present and does not know exactly what was removed but does not believe there were drugs or money in the apartment."

9) Regarding page (7) last paragraph in parenthesis "Garcia does not deny having the kilogram, but does not believe that Ticer would have seen it."  This is incorrect and should read "Garcia denies having a kilogram but does not deny that Ticer would say that...."

10) Regarding page (8) point (7) which reads "Several times, Garcia had Traylor rent him a car in Baton Rouge, which would be used to transport marijuana from there to Florida."  This is incorrect and should read "On one occasion Traylor rented Garcia a car in Baton Rouge which he drove to Nashville for music business, and on another occasion Traylor rented a car to Alley which was recovered in Florida after the homicide...."

11) Regarding page (12) point (14) in parenthesis "Garcia does not know the exact business relationship between Escobar and Silva, but knows that they sometimes worked together."  This is incorrect and should read "Garcia does not know the exact business relationship between Escobar and Silva and does not know if they worked together."

12) Regarding the same paragraph, the sentence which reads "the loads began in amounts from 25 to 50 lbs. and went up to about a hundred pounds at a time." This is incorrect and should read "The loads began in amounts from 1 to 10 lbs. and went up to about a hundred pounds largely to satisfy...Cryer."

13) Regarding the same paragraph in parenthesis "Garcia does not disagree as to total amounts, but says that many deals were between 1 and 10 pounds."  This is

incorrect and should read "Garcia does not believe the total amount recalled by Silva is accurate."

14) The end of the same paragraph reads "Garcia preferred to deal with Escobar, because he got a better price. Garcia also bought quantities of cocaine including several quarter-kilograms." This is incorrect and should read "Garcia would have preferred to purchase marijuana from Escobar because he believed he would have gotten a better price and quality but Silva would not allow this because Garcia was his customer. Garcia also bought one quarter-kilogram of cocaine from Silva."

Reasons I was told or led to believe from [counsel] that the above changes should not be inclusive in the government's factual basis for plea.

a) that much of the above are sentencing issues, not plea issues.

b) that the above is irrelevant to the admission of guilt....

c) that the above has no bearing on the 5 to 40 year guideline range for Count I and the 5 year mandatory for Count III to run consecutively....

d) that excessive changes and/or re-writes of the government's factual basis might possibly jeopardize the plea resulting in trial.

In essence I do not dispute that the government intended to present the evidence as contained in the factual basis. I also understand that presenting it does not necessarily mean that the entirety of the factual basis could be substantiated or that it's entirety is true and correct, hence, the necessity for litigating the guideline at the sentencing hearing, and that this type of litigation is normal and routine in federal sentencing hearings.

*Id.*

On October 3, 1997, Defendant appeared for sentencing. The Court began the

proceedings with the following inquiry:

|  |  |
|---|---|
| THE COURT: | Mr. Garcia, have you had the opportunity, and have you, in fact, read the written presentence report that was prepared in your case? |
| THE DEFENDANT: | Yes, I have. |
| THE COURT: | And have you discussed the content of that written report with you lawyer? |

THE DEFENDANT:  Yes, I have.

Doc. 43 at 3-4.  Defendant was then allowed to present argument on his objections to the

Presentence Report.  Immediately before pronouncing sentence, the Court allowed Defendant to

make a statement:

> There is a few things that I would like to tell you today.  The first is I apologize
> that it took so long for me to get here before you.  And I had hoped that I would
> plead guilty and address this matter long, long ago.
>
> * * *
>
> Counsel has advised me not to speak about the homicide, but against his wishes I
> want to.
>
> * * *
>
> After I was in Toronto after I fled Texas, I...continued to see...priests regularly
> who would help me deal with what I was going through about the homicide
> involving when I took Marty Cryer's life.

*Id*. at 128-130.

> After overruling all of the objections, the Court pronounced sentence:
>
> If ever there was a case where the guidelines did not properly take into account
> the events here, that is...the deliberate murder of Mr. Cryer by this defendant, it
> demonstrates that the guideline range is inappropriate.
>
> And...in considering sentence to be imposed, I find that that inadequately states
> the severity of this offense.  They show 151 to 188 months.
>
> But...that's totally inappropriate here.  The probation officer...has set forth the
> reasons why this Court believes it has not only the authority to do so, but really is
> compelled to depart from these guidelines in an upward manner.
>
> I've heard testimony of various people concerning this defendant.  It's like we're
> hearing and seeing two people sort of like a Jekyll and Hyde....To his parents
> [and] his brother, this defendant presented a side of himself that was as a kind,
> considerate law-abiding and caring individual.

On the other hand, we know from the evidence that he was heavily involved in illegal drug activity, and that he personally used illegal substances since early on in his life, that he was, in fact, a drug enforcer for his own illegal activity, and that he murdered Mr. Cryer to enforce a drug debt....

\* \* \*

It's the judgment of this Court that the defendant be committed to the custody of the Bureau of Prisons to be imprisoned for a term of 300 months as to Count Number I, and 60 months as to Count Number III, the sentence imposed in Count III to run consecutive to that imposed in Count I.

The sentence in Count I is, in fact, a departure upward, and it's rendered pursuant to the policy statement contained in 5K2.1.  The death of Marty Cryer was an aggravating circumstance, which was, in fact, related to the offense of conviction within the meaning of 1B1.3.

This defendant traveled from the State of Texas because a drug customer of his, Marty Cryer, did not pay for a drug shipment of some 117 pounds of marijuana. That...this defendant...armed [himself] with [a] firearm[ ], that [he] confronted Mr. Cryer at a hotel or a motel in Chiefland, Florida, where this defendant shot Marty Cryer to death, shooting Mr. Cryer approximately nine times.

At the time of the murder of Mr. Cryer, Mr. Cryer's wife and Mr. Cryer's small daughter were in an adjacent motel room....

The sentencing guidelines do not take into account a murder such as this in the formulation of the 2D1.1 offense...

Now, this Court, based on the facts of this case, as I have recited here, as we've learned here and are substantiated in the presentence report, finds that an upward departure to an offense level of 39 is appropriate and justified.  The consecutive sentence of five years as to Count III is one mandated by statute.

\* \* \*

The total sentence imposed by the Court today on both counts is 360 months imprisonment....

Mr. Garcia, you have no right to appeal this judgment and sentence, you gave it up at the time you pled guilty, except as to an illegally-imposed sentence or the failure of this Court to correctly apply the sentencing guidelines.

*Id*. at 137-141.

Defendant appealed his sentence, raising one issue related to his extradition from Canada and two issues related to sentencing calculations.  Doc. 93, Attach.  Defendant demanded that appellate counsel raise other issues, principally, an ineffective assistance of counsel claim.  In advising Defendant that he was not going to attack trial counsel on direct appeal, appellate counsel explained, in pertinent part:

> Next, and this ties into your claims of involuntary plea and poor advice regarding the pleas as well, presenting such claims would be inconsistent with the arguments on the "obstruction of justice" and "acceptance of responsibility" issues.  We have, in my view, presented very valid arguments to those sentencing issues.  However, they could be undermined by the inclusion of some information pertaining to the effectiveness of counsel surrounding the plea.
>
> For example, to argue that you did everything under the guidelines to warrant acceptance of responsibility reduction, then say that the statement of facts was incorrect, are contrary arguments.  Moreover as you testified, under oath, as to the factual basis for the plea, the information is considered true, given you admitted such, and going back on that testimony would not be a favorable position to take.  In fact, it could result in perjury charges.

Doc. 83, Attach. V.

This did not assuage Defendant, and appellate counsel sent him another letter addressing his "concerns" in detail:

> A break down of your objections to the "factual basis" is as follows:
>
> 1. [T]his objection [to cocaine and marijuana amounts estimated by Alley] has no bearing on your plea of guilty, as it deals with drug amounts, a sentencing factor.  In that vein, a look at the objection to the PSI shows that you contend 200 lbs. of marijuana went to Louisiana.  As you did not object to point 2, paragraph 1 of the "factual basis," which related that Nancy Cryer could say 800-1000 pounds [of marijuana] were received from you, adding the 200 pounds to the 800 lbs., would reach 1000 pounds.  This still puts you in a Level 28....[T]his objection to the "factual basis" is little, if any import.
>
> 2. You object to Benny and Jessie selling marijuana to you....This has nothing to do with either the plea or sentencing.  It matters not that you may not have known this, as it goes to what others would testify to.  As it has no bearing on the plea or sentencing, this objection is, basically meaningless.

3.  You say that no conversation took place regarding killing Marty.  Again, this has nothing to do with the guilty plea and sentencing....[Y]our objection does not offer anything but a denial.  In effect, there is no meaningful disparity as to this issue, as the bottom line is that it could be testified to occurring and all you can say is that it did not.

4.  You object to the wording only....This simple rewording does not change the underlying fact.  This has no bearing on guilt or innocence and no impact on sentencing.

5.  You object to Poole's statements regarding methamphetamine. [Y]ou do not object to Poole saying that she helped package marijuana.  Your only concern was with the meth, and as such was not part of the plea and sentencing, it has little to do with the overall case.

6., 7., 8.  These objections go to removal of items from your apartment.  While they may go to the obstruction of justice issue, your objections do not rebut what could have been testified to....The "factual basis" represents your position by stating that you didn't remember how [the] request was phrased; you didn't know what was removed; and you did not recall records being there.  We have addressed the conduct of Poole not being "obstructive" in the appeal.  To argue against what others might testify to, without any evidence on the record, would not be successful.

9.  You deny having cocaine that Ticer said she saw.  This, again, had no bearing on the guilty plea and or sentencing.

10.  You object to the use of rented cars being used to transport marijuana.  Again, if Traylor could say so, and the only evidence to the contrary would be your testimony, ti would be left to the trier of fact to decide....[G]iven this does not go to the guilty plea and/or sentencing, it is difficult to find how the "factual basis" was wrong, and any prejudice to you even if it was.

11.  Again, you deny knowledge of Benny and Jesse working together.  The "factual basis" relates this fact....This is not relevant disparity between your version and the "factual basis."

12., 13.  These objections go to total amount of marijuana....[T]here appeared to be sufficient evidence, through your contentions, that at least 1000 pounds of marijuana were connected to the conspiracy.  As such, this objection had little to do with the overall calculation of your sentence.

14.  You object to "factual basis" saying that you preferred dealing with Escobar....Again, this has nothing to do with plea or sentencing.

All of the government's facts were based on what they said could be shown at trial.  You identified that all of it might not be substantial, but offered nothing to rebut any of it.  Given that the majority of differences between your version and the government's were trivial and had no bearing on the issue of guilt, challenges to the "factual basis" would not result in meaningful benefit.  In fact, in looking at the essence of what you <u>did</u> <u>not</u> object to, along with your contentions in objecting to the PSI, it is not apparent that things would have been different had your changes been considered.

As to your concerns as to Mr. Miller being ineffective for urging you to plead according to the "factual basis," and not filing your proposed [changes], I can not agree with your position.

First...the majority of your changes were totally irrelevant to counts I and III.  In this aspect, Miller was correct.  Miller was also correct in that the changes had no bearing on the statutory sentencing provisions for Counts I and III.

Next, as there needs to be shown that (1) there was deficient performance and (2) prejudice to you it appears that the record, as it stands, would not support the claim.  Courts give great deference to an attorney's strategic choices.  As such, and given the points raised above, Miller can not be clearly said to be deficient in failing to submit the document of your "concerns" to the court.

Given all of the above, I could not, in good faith, submit the requested argument.  While I strive to be as thorough as possible in presenting issues, I have a duty to the court not [to] file issues that lack merit.  It is my opinion that, after reviewing the documents mentioned above, there is little, if any, merit to your argument regarding the "factual basis."

Doc. 83, Attach. J.  *See also* Doc. 28.

The appeal proceeded on sentencing issues only.  In ruling on the appeal, the Eleventh

Circuit initially stated:

The marijuana conspiracy involved shipments of marijuana from Texas to Florida.  In determining relevant conduct under the Sentencing Guidelines and in departing upward from the Guideline range the sentencing judge considered other marijuana dealings engaged in by the defendant beyond those to which he pleaded guilty, namely shipments to Louisiana.  In departing from the Guideline range the sentencing court also relied on defendant's murder of Marty Cryer, the distributor of defendant's marijuana in Florida who had refused to pay his debt to defendant.  There was abundant evidence before the sentencing judge to support the conclusion that defendant had murdered Cryer and had also been involved in marijuana shipments to Louisiana.

*Garcia*, 208 F.3d at 1260.  As to the first sentencing issue, which attacked the Court's

adjustment for obstruction of justice, the court of appeals found:

> The factual and legal sufficiency of the destruction of evidence ordered by
> defendant is such that discussion of the burial of the guns and the flight to Canada
> is not needed.

* * *

> When [Defendant] pled guilty the written factual basis acknowledged by him
> contained an account of how, after the murder of Cryer, he asked his secretary to
> go to his apartment to remove money and cocaine and burn handwritten financial
> records, photographs of a man and a map showing locations in Florida.  The
> government's discussion of these matters at the sentencing noted that these were
> photographs understood by the secretary to be of Cryer and a map understood by
> her to related to his location.

> Appellant makes a strained argument that his conduct did not amount to
> obstruction either because no federal investigation was underway or was not a
> hindrance because the investigation had abundant evidence from other sources.

> These arguments are flimsy if not frivolous.

*Id*. at 1261-62.

With regard to the other sentencing issue, i.e., whether the Court erred in finding that

Defendant had not accepted responsibility for his actions, the Court held:

> [Defendant's] final argument is that the sentencing court erred in finding that he
> had failed to show the acceptance of responsibility for his offense that would
> warrant a reduction....Such a showing is a defendant's burden. [Defendant]
> stresses his guilty plea as a demonstration of acceptance.  But that fails far short
> of showing acceptance of responsibility in circumstances characterized by active
> avoidance of responsibility from the start to near the finish.  The record is replete
> with evidence supporting the sentencing judge's finding, ranging from the
> destruction of evidence, hiding out, living under an assumed name in Canada, to
> frivolous denials of overwhelming identification evidence after he was arrested
> there, and a frivolous claim in Canada that he was subject to a federal death
> penalty if extradited (after the only possible death penalty by the state of Florida
> had been waived).  The appellant fell short of showing entitlement to a reduction
> for acceptance of responsibility merely because he ultimately pleaded guilty.

*Id*. at 1262-63.

The instant § 2255 motion ensued.  On this occasion, Defendant raises the following

grounds for relief: (1) that his plea was involuntary; (2) that his trial counsel rendered ineffective

assistance; and (3) that his appellate counsel was also ineffective.  Doc. 83.  Each issue will be

addressed in turn.

## DISCUSSION

I.      Involuntary plea.

        In his first ground for relief, Defendant maintains that he "entered into [his] guilty plea

unknowingly and involuntarily."  *Id*. at 4.  According to Defendant, counsel "improperly and

unethically coerced [him] to plead guilty to a plea of no benefit."  *Id*.  Counsel's "inducement"

included a "reduction of [Defendant's] maximum sentencing exposure from 60 years to 40

years" and a reduction for acceptance of responsibility.  *Id*. at 4-5 & 9.  Additionally, counsel

"coerced [Defendant] into signing a largely untrue factual basis for plea...which [he] signed

within minutes of the change of plea hearing because counsel threatened that the plea would be

off if [he] did not sign it and that [he], therefore, would not receive the benefit of the plea...."  *Id*.

at 9.  Furthermore, according to Defendant, counsel "also unethically threatened [him] that [he]

was not to question the facts when [he] was before the judge at the change of plea hearing" and

then "prepared a script for [him] to read at the change of plea hearing to assure [his] compliance

with his designs."  *Id*.

        In response, counsel for the Government advises that he "has spoken to Mr. Miller, who

categorically denies that he told the defendant to make any false statement or to agree with any

false statement made by the government."  Doc. 93 at 4.  He concludes: "Given the defendant's

obvious interest in the outcome of this motion, the defendant's contrary sworn statements at re-

arraignment, and the defendant's three serious felony convictions, a hearing is not required to determine whether Mr. Miller or the defendant should be believed."  *Id.*

"A plea of guilty cannot support a judgment of guilt unless it was voluntary in a constitutional sense."  *United States v. Brown*, 117 F.3d 471, 476 (11th Cir. 1997).  "A plea is voluntary in a constitutional sense if the defendant receives real notice of the charge against him and understands the nature of the constitutional protections he is waiving."  *United States v. Frye*, 402 F.3d 1123, 1127 (11th Cir. 2005).  To determine that a guilty plea is knowing and voluntary, the district court must establish that the plea is free from coercion, that the defendant understands the nature of the charges, and that the defendant knows and understands the consequences of his plea.  *Id.*  Representations made by the defendant, his attorney, and the attorney for the Government and the findings of the court at the plea hearing "constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."  *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

Counsel need only provide a client who enters a guilty plea with an understanding of the law in relation to the facts, so that the accused may make an "'informed and conscious choice.'"  *Downs-Morgan v. United States*, 765 F.2d 1534, 1538 (11th Cir. 1985) (citations omitted).  "To be entitled to collateral relief, the accused must 'prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.'"  *Id.* at 1539.  When "'counsel has induced his client to plead guilty based on patently erroneous advice...the plea [may be]...involuntary and unknowing,'" *id.*, and the "fact that the trial court complied with

Fed. R. Crim. P. 11 does not guarantee that the guilty plea is constitutionally valid." *Id*. at 1538 n.9.

The Court agrees that a hearing is not necessary to address this issue. Although Defendant has certainly presented more than conclusory allegations of his counsel's actions and supported them with a sworn declaration and an affidavit from him and his father, respectively, *see* Doc. 83, Attach. A & B, the Court believes that these nevertheless are "contentions that in the face of the record are wholly incredible" that should be summarily dismissed. Defendant stood before the Court and swore (1) that there were no "undisclosed promises or inducements" that had led him to plead guilty; (2) that neither his lawyer nor any other person had "told [him] anything or promised [him] anything that [was] different from...or in addition to the matters...contained in the written plea agreement that [had] led...or contributed to [his] decision to plead guilty"; and (3) that no person had used "any type of threat, force, pressure, [or] intimidation of any type" to make him plead guilty. Doc. 57 at 30-33. Counsel for the Government and for Defendant likewise advised the Court that "no assurances, promises, or understandings [had] been given to [Defendant] as to the disposition of his case which [were] different or contrary to what [had] been discussed...in open court." *Id*. Defendant's assertions now to the contrary fly in the face of the "[s]olemn declarations" that he–and two officers of this Court--made to the Court's repeated questions regarding the voluntariness of his plea. The Court gave Defendant numerous opportunities on that occasion and again at sentencing to make any statement that he wished. At no point did he advise the Court about the alleged unethical tactics of his attorney or his allegedly erroneous advice regarding his sentencing exposure even though the Court asked him specifically about the quality of his counsel's representation.

The Court does not doubt that Defendant's attorney told him that if he did not sign the statement of facts, which was in its third draft, or if he attempted further to correct the facts beyond the matters noted in the parentheticals, the Court would cancel the plea hearing.  The Court also does not doubt that counsel presented Defendant with the proper wording for asserting his Fifth Amendment right against self-incrimination as a part of his preparation for the plea.  However, even accepting Defendant's representations in this regard as absolutely true, neither of these instances shows any dereliction of counsel's duty to his client or amounts to erroneous advice as would be required to question the voluntariness of Defendant's plea.  Counsel's warning to Defendant about the consequences of his continued pressing of inconsequential factual discrepancies and his preparation of Defendant for a proper assertion of the right to remain silent about the murder of Marty Cryer do not amount to coercion or inducement but rather are matters of proper attorney preparation and counseling.

In short, there is no merit to Defendant's claim that his plea was involuntary.

II.     Ineffective assistance of counsel.

Because two of Defendant's claims involve allegations that his counsel was ineffective, a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's]

inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

A.      Trial counsel.

Defendant maintains that trial counsel, Tom Miller, was ineffective because he (1) "compelled" Defendant to plead guilty, (2) failed to move for an evidentiary hearing regarding the veracity of the Statement of Facts, (3) failed to withdraw based on a conflict between him and Defendant, and (4) failed to seek "a tentative finding regarding the government's request for an upward departure...." Doc. 83 at 5, 9-12. Each allegation of ineffectiveness will be considered in turn.

As to Defendant's assertion that Mr. Miller "compelled" him to plead guilty, the Court finds it without merit.  For the most part, Defendant's arguments on this claim merely mirror those made with regard to the voluntariness of his guilty plea, i.e., that counsel coerced him into signing a "largely untrue factual basis," that counsel erroneously advised him regarding his maximum sentencing exposure and promised him a sentence reduction for acceptance of responsibility, and that counsel threatened him that the district judge "would walk off the bench" and that he would lose the benefit of the plea.  The Court has already found these arguments unavailing, and Defendant's recasting them as ineffective assistance of counsel claims does not give them merit.  As previously found and more fully discussed *supra*, these allegations fly in the face of Defendant's sworn statements at the plea hearing and do not remotely support a claim that counsel's "performance was below an objective and reasonable professional norm." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

As to the other compulsion claims which have not been previously addressed, they are equally without merit.  First, Defendant's suggestion that he was erroneously advised that he "was guilty of using a carrying a firearm during the charged marijuana dealings when counsel knew that there were no marijuana dealings on the day alleged in the indictment" is disingenuous. Defendant tracked Marty Cryer to Florida to collect a bad drug debt which Cryer refused to pay. Defendant carried a firearm on the day in question and then used it to kill a person who owed him drug money.  Defendant unequivocally admitted this during his plea: "The last full paragraph of the factual statement...is correct, and that–I do claim responsibility and I'm guilty of carrying a firearm in furtherance of a controlled substance offense as alleged in Count III."  Doc. 57 at 24-25.  Merely because Defendant was not actively buying, selling, or exchanging drugs or arranging a drug deal does not change the fact that he killed Cryer with a gun "during and in

relation to a drug trafficking crime." *See* 18 U.S.C. § 924(c). In this regard, counsel would have been deficient only if he had told Defendant otherwise.

Second, Defendant's claim that his attorney promised him that "the untrue facts...would not be held against [him] at sentencing" is belied by Defendant's sworn statements at his plea that his attorney made no undisclosed promises to him. Furthermore, as Defendant's appellate counsel thoroughly explained to him, the areas of variance between the factual statement which Defendant signed and agreed to in open court and his "concerns" were of absolutely no consequence and had absolutely no bearing on the sentence which Defendant received.

A review of the sections of the Presentence Report addressing the offense conduct and Defendant's objections verifies this conclusion. Out of all of Defendant's "concerns," the only two which Defendant continues to press and which carried over into the PSR were (1) the items which Poole removed from Defendant's apartment and (2) the conversation with Gloria Cryer regarding killing Marty Cryer. According to Defendant, Poole, who was Defendant's secretary, did not remove cocaine or money from his apartment, and she did not burn any financial documents, as set forth in the Statement of Facts. *See* Doc. 23 at 6-7. Instead, according to Poole's affidavit, she was directed by Defendant

> to go to his apartment and remove all his personal belongings, i.e., furniture, clothing, music equipment, miscellaneous kitchen ware and toiletries etc, and have them delivered to his girlfriend.

> * * *

> There was no money or cocaine in [Defendant's] apartment nor did [Defendant] indicate that there would be.

> * * *

> [Defendant] also asked that I remove and dispose of one photo and one map from his office, which I did. I disposed of the photo in a dumpster. There was only

one photo.  The map, which I also disposed of, was new and unused, and contained no markings or locations or directions.

Additionally, there were no hand written or typed drug records or drug ledgers of any kind in [Defendant's] apartment or office when I attended to carry out [Defendant's] instructions....All office equipment and business material were delivered to [Defendant's girlfriend] along with [Defendant's] personal belongings....

Doc. 83, Attach. D.  In Defendant's estimation, Poole's apparent recantation of certain aspects of statements she made to law enforcement was "material and did affect [his] sentence...."  Doc. 83 at 5.  Therefore, counsel was ineffective for "coercing" him to agree to the Poole portion of the Statement of Facts.

It is clear from the PSR that the identity of the items Poole removed from the apartment was not paramount to the two-point enhancement for obstruction of justice.  Instead, the enhancement focused on the very act of directing an employee to take steps to facilitate Defendant's flight and his subsequent surreptitious flight from this country.  Neither Defendant nor Poole denies that Defendant directed Poole to "remove items from his...apartment" and to "close[ ] bank accounts and distribute[ ] the money to the defendant's girlfriend and/or mother," PSR at 18-19, and Defendant cannot deny that he used an assumed name and fled the United States while his co-defendants were prosecuted.  Thus, it was of absolutely no consequence, much less "outrageously detrimental consequence[ ]," Doc. 83 at 5, whether Poole removed drugs, money, and drug-related financial documents from the apartment or whether she merely removed "furniture, clothing, music equipment, miscellaneous kitchen ware and toiletries...." Doc. 83, Attach. D.  The bottom line is that she aided Defendant's flight at his direction. Therefore, Defendant was not prejudiced by counsel's alleged coercion.

As to the "statements falsely attributed to Gloria Cryer (that [Defendant] often talked about killing Marty)," Doc. 83 at 9, the PSR unequivocally shows that none of the allegations that Defendant had previously discussed kidnapping and killing Marty Cryer affected sentencing. *See* PSR at 21-27 (Objections That Do Not Affect Sentencing).  At sentencing, the Court did not make a finding that there was "premeditated 'deliberat[ion]'" in the killing of Marty Cryer, as Defendant has paraphrased the Court's ruling.  Doc. 83 at 10.  Rather, the Court found that the murder was "deliberate" and occurred "to enforce a drug debt."  Doc. 43 at 137-38.  Neither of those findings can be seriously disputed–the murder of Marty Cryer was not an accident, and it was committed during the course of trying to recover moneys which Cryer owed Defendant for past drug shipments.  It was not the alleged discussions between Defendant and others regarding killing Marty Cryer which prompted the upward departure for aggravated circumstances related to the drug conviction.  Instead, these are the facts which the Court found significant:  (1) Defendant traveled from Texas to Florida because Marty Cryer did not pay for a large marijuana shipment, (2) he was armed with a firearm at the time he confronted Cryer at the Chiefland motel, and (3) he shot Cryer nine times while Cryer's daughter and wife were in the room next door.  The alleged conversations did not enter into the equation; thus, it was of no consequence that the conversations were included in the Statement of Facts.

Furthermore, counsel was not ineffective for failing to move for an evidentiary hearing regarding the veracity of the Statement of Facts.  As discussed *supra*, Defendant's concerns were misplaced and inconsequential, and a hearing on the matter would not have been fruitful.  Counsel is never required to seek a hearing on frivolous issues.

As to his allegation that counsel was ineffective for failing to withdraw, Defendant maintains that counsel "should have moved to remove himself" after he informed counsel

that the factual basis was largely untrue...instead of persisting and insisting that [Defendant] sign and swear to the false facts because at that point counsel and [Defendant] had a conflict because (1) he either did not believe me, or (2) he was actually working for the prosecution's best interest....

Doc. 83 at 11.  This charge is flatly belied by Defendant's statements at the change of plea hearing.  At that time, Defendant was given every opportunity to inform the Court of counsel's alleged conflict.  He did not make any claims in that regard, and the Court will not entertain them further.

In addition, Defendant cannot show "specific instances in the record that 'demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Caderno v. United States*, 256 F.3d 1213, 1218 (11th Cir. 2001) (quoting *Cuyler v. Sullivan*, 528 U.S. 1082 (1980)).  A "'speculative or hypothetical conflict...does not violate the Constitution.'" *Caderno*, 256 F.3d at 1218 (citation omitted).  Counsel's alleged insistence that Defendant acknowledge the veracity of the Statement of Facts does not demonstrate an actual conflict of interest.  Defendant's "concerns" were really of no concern, and counsel recognized that fact.  To advise a client that it is in his best interests to go forward with a plea in the face of inconsequential factual discrepancies and to warn him that the judge will not be inclined to entertain the plea if there are extensive on-the-record disagreements about the agreement or the statement of facts are well within the purview of counsel's duties to his client.  These actions not only do not amount to an actual conflict but also did not adversely affect counsel's performance.

Finally, Defendant complains that counsel was ineffective when he failed to seek "a tentative finding regarding the government's request for an upward departure...."  This allegation again focuses on the "false facts that trial counsel made [him] sign and swear to."  Doc. 83 at 12. As previously discussed, any claim related to the alleged "false facts" is without merit and does

lignment

not bear any further consideration.  The Court does note, however, that counsel did object to the

probation officer's recommendation of an upward departure, and the Court heard argument on

the objections at sentencing.  This was sufficient hearing and indeed, this is the only hearing

usually afforded a defendant regarding his objections to the PSR.

In conclusion, the Court finds that trial counsel did not render ineffective assistance to

Defendant, and all of those claims should be denied.

B.      Appellate counsel.

Defendant claims that appellate counsel was ineffective for failing to raise on appeal (1)

the voluntariness of his plea , (2) trial counsel's ineffectiveness, and (3) a due process issue

related to the use of "uncharged conduct" to enhance and depart upwardly Defendant's sentence.

Doc. 83 at 6, 12-13.  As to the first two allegations, appellate counsel thoroughly explained to

Defendant why he was not pursuing either of these strategies on appeal.  *See* Doc. 83, Attach. J

& V.  Counsel's explanations for rejecting Defendant's proposals are well formed and

comprehensive and plainly reasonable, and thus, his decision to forego pressing claims which he

reasonably believed would be counterproductive to the stronger arguments cannot be questioned

under *Strickland*, since the Court can look only at the reasonableness of the chosen strategy, not

whether there might have been other avenues for appeal.

Finally, Defendant maintains that appellate counsel was ineffective for failing to raise an

*Apprendi* issue on direct appeal.  *Apprendi* was decided several months after Defendant's

conviction was originally affirmed by the Eleventh Circuit.  That Court has found that the failure

of an attorney to anticipate *Apprendi* is not ineffective assistance of counsel.  *United States v.*

*Ardley*, 272 F.3d 991, 993-94 (11th Cir. 2001).

**<u>CONCLUSION</u>**

For the reasons stated herein, the Court recommends that the second amended motion to vacate be denied because Defendant has not shown that his guilty plea was involuntary or that either his trial or appellate counsel was ineffective.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's second amended motion to vacate, Doc. 83, be **DENIED.**

**IN CHAMBERS** at Gainesville, Florida, this 13th day of April, 2006.


_s/ A. KORNBLUM_____
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**



<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**